STATE OF NEBRASKA, APPELLEE, V. JEFFREY R. LOWREY, APPELLANT.

476 N.W.2d 540

Filed October 25, 1991. No. 90-959.

Vincent M. Powers for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

Defendant appeals from an order of the district court which affirmed a judgment of the county court finding defendant guilty of operating a motor vehicle while under the influence of alcoholic liquor and of failure to yield the right-of-way. We affirm.

Errors assigned by the defendant are that (1) the trial court erred in finding that there was sufficient evidence to support a finding of reasonable grounds to believe defendant was operating a motor vehicle while under the influence of alcoholic liquor, and (2) the trial court erred in determining that there was sufficient foundation to allow the introduction of the Intoxilyzer test results at trial.

Factual findings of a judge who serves as the trier of fact in a criminal case will not be disturbed on appeal unless clearly wrong. *State v. Grantzinger*, 235 Neb. 974, 458 N.W.2d 461 (1990).

On May 27, 1989, Lowrey caused an accident which occurred in the intersection at 27th Street and Highway 2 in Lincoln. Lowrey was heading east and turned left to go north on 27th Street when he failed to yield the right-of-way to another motorist, who was driving his car westward on Highway 2.

Lincoln police officer Patrick Knopick arrived at the scene of the accident and approached Lowrey, who was standing in the open doorway of his pickup, leaning against the seat. The officer asked the defendant to show his driver's license, registration, and proof of insurance. Lowrey produced a driver's license, but was unable to locate the registration and proof of insurance, which were later found in Lowrey's pickup by the officer.

Knopick noticed that Lowrey was unstable on his feet, had bloodshot, watery eyes, and had the odor of alcoholic beverage

about his person and breath. Officer Knopick then asked Lowrey to step over to his police cruiser. When defendant exited his vehicle, he fell against the pickup's box. Knopick testified that Lowrey told him he would not be able to make it and that Lowrey had to hold onto the officer.

Officer Jeffrey Howard, a "testing officer," was dispatched to the scene to test the defendant. Howard determined that the defendant was not capable of participating in any field sobriety tests. He noticed that Lowrey's speech was slurred, his eyes were watery, and his eyelids were droopy. Furthermore, he observed that defendant had a very red, flushed face; dry, smacking lips; and a staggering walk. When asked to repeat the alphabet, defendant slurred from *a* to *t*, then stopped and became confused. The officer next asked defendant to count backward from 100. Although told by the officer to stop counting at 60, Lowrey continued. Defendant was then administered an Alco-Sensor pretest, which he failed.

Defendant was then arrested for drunk driving and taken to the detoxification center for an Intoxilyzer test. After Lowrey signed the implied consent form, Officer Howard checked the maintenance, repair, and calibration of the Intoxilyzer Model 4011AS machine. Lowrey blew into the mouthpiece attached to the machine, and the Intoxilyzer registered .157 of a gram of alcohol per 210 liters of breath. The officer then advised the defendant of his *Miranda* rights, and Lowrey confessed that he drank three bourbon and water drinks that evening.

Apparently, defendant's first argument is that there was insufficient evidence to support a finding that the officer had reasonable grounds to believe that defendant was under the influence of alcoholic liquor so as to justify him in requiring defendant to submit to a preliminary test of his breath. See Neb. Rev. Stat. § 39-669.08 (Reissue 1988).

In the first place, defendant overlooks the fact that § 39-669.08(3) authorizes an officer to require a driver to submit to a preliminary test of his or her breath "if the officer has reasonable grounds to believe that such person has alcohol in his or her body, has committed a moving traffic violation, or has been involved in a traffic accident." Defendant was guilty of failing to yield the right-of-way and, inasmuch as the

accident caused $9,000 damage to his vehicle, he was certainly involved in a traffic accident.

Be that as it may, the evidence that defendant was under the influence of alcohol was overwhelming. It seems to be the defendant's position that the officer made up his mind immediately upon arriving at the scene that the defendant was intoxicated. This is not true. Officer Knopick was asked by defendant's counsel, "[S]o the two factors upon which you based your opinion that the defendant who had been involved in a serious automobile accident was under the influence of alcohol was [sic] the odor of alcohol and bloodshot, watery eyes alone? Correct?" To this the officer answered, "Correct." However, the decision to run a preliminary breath test was not made until after the defendant's condition seemed to be so hopeless that field sobriety tests could not be administered.

The trial court heard the evidence and made the determination that the officer had reasonable grounds to believe the defendant was intoxicated. In determining the sufficiency of the evidence to support a factual conclusion made by the trial court in a criminal case, this court does not resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. See *State v. Green*, 238 Neb. 328, 470 N.W.2d 736 (1991). That determination is for the finder of fact, whose finding must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *Id.* The testimony of the officers constitutes overwhelming evidence that they had reasonable grounds to believe that Lowrey was under the influence of alcohol before they administered the preliminary breath test and arrested him. There is no merit to defendant's first assignment of error.

Defendant next attacks the accuracy of the Intoxilyzer machine used to test him.

Officer Howard testified that the machine was working properly. He also stated that the machine had been calibrated, noting that fact from the maintenance certificate that was right next to the cabinets and over the machine.

Rex Thompson, executive director of the detoxification center, is responsible for the maintenance and calibration of the

Intoxilyzer machine that was used to test the defendant. Thompson testified that he tests the Intoxilyzer regularly. He performed a "190 day check" before and after the machine was used to test the defendant, that is, 190-day checks on March 24 and August 10, 1989. The 190-day-check sample is used to show that the Intoxilyzer does not deviate more than 10 percent, the maximum deviation allowed. According to Thompson, the Department of Health laboratories provide an unknown solution that the detoxification center runs through the Intoxilyzer. The detoxification center sends the results back to the Department of Health laboratories, which in turn inform the detoxification center whether the test met the standards. Thompson agreed that he had no personal knowledge of whether the Department of Health performed its task accurately.

Thompson also performed a "40 day check," which is a maintenance check, before and after May 27, 1989, the day the machine was used to test Lowrey. The machine worked properly on both days.

Further, Thompson performed a beam attenuator test before and after May 27, 1989, that is, on December 14, 1988, and July 14, 1989. The tests met the required standards. Thompson testified that the beam attenuator uses a breath simulator solution and that the accuracy of the beam attenuator test relies on the accuracy of the solution that is used. Every solution is good for 1 year or 20 uses, whichever comes first. A solution No. 27 or a solution No. 14 was used around May 27, 1989. Those solutions were tested by Ted Koperski of the Department of Health on June 3, 1988, and on May 8, 1989. Thompson had no personal knowledge of whether solutions Nos. 14 and 27 were accurate, and he had to rely on Koperski's tests for the accuracy of the certificates.

Defendant argues insufficient foundation for admission of the results of the Intoxilyzer test because Thompson had no personal knowledge of the accuracy of the solutions used in the tests to check the reliability of the Intoxilyzer. It is defendant's position that without the testimony of Koperski, the State cannot prove that the Intoxilyzer was in operating order and complied with title 177 of the Nebraska Administrative Code,

which was received in evidence.

An appropriate method for testing the breath with an Intoxilyzer is found in attachment 3 to 177 Neb. Admin. Code, ch. 1, § 007.04A3 (1987). Attachment 3 is a checklist form which was used by the law enforcement officer and was introduced into evidence. The officer completed all the steps set forth in that attachment.

Section 007.05D states that only simulator solutions can be used which have been prepared as shown by a certificate of chemical analysis, which certification shall be in the form of attachment 12. Two exhibits were introduced which conform with attachment 12: exhibits 14C and 14H, which are certified and sworn to by Koperski, certify the accuracy and integrity of solutions Nos. 27 and 14 respectively.

It is provided by § 007.06B that "testing devices used for direct breath testing shall have been checked within 190 days prior to an analysis by a person responsible for maintenance and calibration." Exhibits 14D and 14E are sworn certificates of "John Blosser, agency administrator of 177 NAC 1," for the Department of Health laboratories, that the 190-day checks on the particular Intoxilyzer were performed.

In *State v. Kudlacek*, 229 Neb. 297, 426 N.W.2d 289 (1988), this court held that reasonable proof that an Intoxilyzer machine was accurate and functioning properly is all that is required as foundation evidence. This holding was based on an earlier decision, *State v. Snyder*, 184 Neb. 465, 168 N.W.2d 530 (1969), regarding the test of radar equipment. The defendant's position in *Snyder* was that unless there is proof that the speedometers of the patrol cars and the calibrated tuning fork were accurate, there was insufficient proof that the radar equipment was accurate and functioning properly. In other words, the defendant argued that any comparative testing devices used to determine whether the particular radar equipment was accurate and functioning properly must themselves be proved to be accurate and functioning properly. In *Snyder*, this court held that "[s]uch a chain of evidence might have to proceed ad infinitum." *Id.* at 466, 168 N.W.2d at 531.

Reasonable proof that the particular radar equipment employed on a specific occasion was accurate and

functioning properly is all that is required. Evidence that radar equipment was tested within a few hours of its use, by means of a calibrated tuning fork, or by a comparison with the speedometer of a motor vehicle driven through the radar field, and was functioning properly, is sufficient evidence of the accuracy of the radar equipment.

*Id.* at 467, 168 N.W.2d at 532. See, also, *State v. Kincaid*, 235 Neb. 89, 453 N.W.2d 738 (1990).

This court noted in *State v. Chambers*, 233 Neb. 235, 240, 444 N.W.2d 667, 670 (1989), "In *Snyder* and *Kudlacek*, we rejected the argument that for admissibility of information from a primary instrument, the accuracy of the primary instrument, such as a measuring device, must be established by an appropriate testing device which itself has been tested for accuracy . . . ." However, this court added:

Without some proof of reliability in the device used to test for accuracy in a primary device, a test for accuracy of the primary device is a meaningless exercise. . . . In any event, we hold that to present "reasonable proof" that a stopwatch was operating correctly as an accurate device to measure time, the watch must be tested against a device whose instrumental integrity or reliability has been established either through proof that the testing device's accuracy has been verified through an independent test for accuracy or through proof that the testing device is the type recognized and normally used to verify accuracy in stopwatches.

*Chambers, supra* at 241, 444 N.W.2d at 671.

The evidence shows that the Intoxilyzer had been calibrated and that Thompson, the person responsible for its maintenance and calibration, tested the Intoxilyzer regularly. He performed the 190-day checks and the 40-day checks before and after the machine was used to test the defendant. The machine checked within the required standards every time. Furthermore, Thompson performed a beam attenuator test on the Intoxilyzer before and after it was used on the defendant. Although the beam attenuator only needs to be checked once a year, the detoxification center performs the tests at a minimum of twice per year. Although Thompson had no personal knowledge of

whether the solutions Nos. 14 and 27 were accurate, there is evidence that the solutions were tested by Koperski of the Department of Health and were found to be within acceptable limits.

In accordance with *Snyder*, *Chambers*, *Kudlacek*, and *Kincaid*, the State met its burden in establishing the solutions' accuracy through independent sources and in showing reasonable proof that the Intoxilyzer was functioning accurately and properly. To require more would be to extend the chain of evidence requirement "ad infinitum."

The judgment is affirmed.

AFFIRMED.